**David B. Owens (SBN: 275030)**
Anand Swaminathan*
Steven Art*
Ruth Brown*
Isabella Aguilar*
david@loevy.com
Loevy & Loevy
311 N. Aberdeen St., 3rd Fl.
Chicago, IL 60607
Phone: (312) 243-5900
Fax: (312) 243-5902
*Admitted *pro hac vice*
*Counsel for Plaintiff*

**UNITED STATES DISTRICT COURT FOR THE NORTHERN DISTRICT OF CALIFORNIA**

| | |
|---|---|
| FRANCISCO VALLE,<br><br>Plaintiff,<br><br>v.<br><br>PAOLO MORGADO, DENNIS CRAVALHO, ANGELA ROUEDE, DETECTIVE D. OLSEN, MICHAEL GAYNOR, MICHAEL PHILPOTT, JENNIFER JACKSON, ROBERT MOSER, JERRY TIDWELL, PAUL CHIGNELL, CITY AND COUNTY OF SAN FRANCISCO, and UNKNOWN OFFICERS OF THE SAN FRANCISCO POLICE DEPARTMENT,<br><br>Defendants. | Case No. 21-CV-5636<br><br>**FIRST AMENDED COMPLAINT FOR DAMAGES & OTHER RELIEF**<br><br>**JURY TRIAL DEMANDED** |

Plaintiff FRANCISCO VALLE, by counsel, LOEVY & LOEVY, hereby complains against Defendants PAOLO MORGADO, DENNIS CRAVALHO, ANGELA ROUEDE, DETECTIVE D. OLSEN, MICHAEL GAYNOR, MICHAEL PHILPOTT, JENNIFER JACKSON, ROBERT MOSER, JERRY TIDWELL, PAUL CHIGNELL, CITY AND COUNTY

OF SAN FRANCISCO, and UNKNOWN OFFICERS OF THE SAN FRANCISCO POLICE DEPARTMENT, and states as follows:

**INTRODUCTION**

1. Plaintiff Francisco Valle was a fifty-one-year-old painter and father living in Lodi, California. His world was suddenly turned upside down when San Francisco Police Officers Paolo Morgado and Dennis Cravalho falsely accused him of shooting at them on May 19, 2007.

2. Plaintiff did not shoot at the officers. Plaintiff did not possess a weapon, and did not fire a single shot.

3. What actually occurred is that Defendant Morgado recklessly began shooting at Plaintiff from his police vehicle, without any warning or provocation whatsoever.

4. Defendants Morgado and Cravalho had stopped Plaintiff on the San Francisco streets. Plaintiff immediately surrendered and put his hands out. Despite demonstrating immediate and thorough compliance, Defendant Morgado began firing at Plaintiff. Morgado shot Plaintiff on his right hand, causing severe bleeding and injury. Plaintiff feared that the officers were about to murder him.

5. Another man, who had taken cover behind a nearby vehicle, began firing his own weapon back at Morgado.

6. Hoping to stop the shootout, and avoid being shot again, Plaintiff grabbed the gun from the other man and ran away. He was found a few blocks away, laying in some bushes, bleeding profusely.

7. It is a miracle that neither Plaintiff, nor the two officers and the other man, was killed. In fact, by grabbing the gun from the other man and running away, Plaintiff likely saved the lives of one or more of the two civilians and two officers.

8. But tragically, that fact was instead used by Defendants Morgado and Cravalho to frame Plaintiff for a crime they knew he did not commit.

9. Defendants Morgado and Cravalho committed grossly reckless and egregious

conduct that night, shooting at an unarmed man with his hands out in full compliance. Knowing that they had engaged in what was essentially criminal misconduct, Morgado and Cravalho decided to concoct a story in order to cover-up their misconduct and to frame Plaintiff for attempted murder. They falsely claimed that the first shots were fired at the officers, that they merely responded to being shot at, and most remarkably, that it was Plaintiff—not the other man—that had the gun and had shot at them. In addition, the officers erased the other man from the story entirely: they falsely claimed that no other person was present at the scene.

10. Defendants Morgado and Cravalho had a second reason to cover-up their misconduct and concoct a false narrative to frame Plaintiff: they were corrupt police officers who had long records of misconduct and criminality. In fact, they were already on thin ice. Morgado had been previously convicted of battery of a civilian, and was undergoing disciplinary proceedings for another instance of misconduct against a civilian during the time of Plaintiff's trial. And Cravalho, too, had a long history of misconduct and had been previously convicted of a crime.

11. Much of this evidence of Morgado and Cravalho's criminality, including lies, fabrications, and aggressive behavior toward civilians, and the status of ongoing disciplinary proceedings against them, was withheld from Plaintiff and his attorneys before trial by Defendants Morgado, Cravalho, Jennifer Jackson, Robert Moser, Jerry Tidwell, Paul Chignell, Michael Gaynor, and Michael Philpott.

12. And Defendants including Angela Rouede, Detective D. Olsen, Gaynor, and Philpott participated in the scheme to frame Plaintiff by fabricating additional false evidence against Plaintiff and suppressing evidence.

13. Ultimately, Plaintiff's trial was a credibility contest between Defendants Cravalho and Morgado, on one side, and Plaintiff on the other. Cravalho and Morgado came to trial and testified falsely to their concocted version of events. Deprived of the evidence of both officers' range of misconduct, and presented with fabricated evidence, the jury believed the officers' false testimony and Plaintiff was wrongly convicted.

14. Defendant City and County of San Francisco also committed reckless violations of Plaintiff's rights by letting two plainly corrupt police officers remain on the force. Both Defendants Morgado and Cravalho had long histories of misconduct in addition to their criminal convictions. Indeed, the California Court of Appeal wrote that "the breadth and magnitude of the claimed misconduct [of Cravalho] is impressive" and "covers the rainbow," and the Court of Appeal described him as "a proven teller of untruths." Yet, Defendant City and County of San Francisco permitted both officers to continue to carry a gun and a badge and patrol the citizens of San Francisco, able to take their liberty—or their lives—based on nothing more than their meaningless say-so.

15. Defendant City and County of San Francisco's failure to train, supervise and discipline rogue police officers like Defendants Morgado and Cravalho was part of a broken hiring, training and disciplinary system that allowed officers to commit misconduct with near-impunity. It emboldened officers like Morgado and Cravalho to engage in the sort of reckless misconduct that injured Plaintiff, and the lies and fabrications used to frame him. And Defendant City and County of San Francisco's policy and practice of suppressing *Brady* information that would call into question the testimony of police officer witnesses further caused Plaintiff's wrongful conviction.

16. Because of the Defendants' misconduct, Plaintiff was found guilty and sentenced to two consecutive life terms, plus 45 years. For more than a decade, Plaintiff lived in a cage, grappling with the injustice and anguish of his wrongful conviction, never knowing if he would be free again to see his family.

17. While he was imprisoned, Plaintiff appealed his conviction, fighting tirelessly to prove his innocence and win his freedom.

18. In 2020, after the Court of Appeal for the State of California determined that Plaintiff had been denied his constitutional rights under *Brady v. Maryland* to exculpatory and impeaching evidence, the San Francisco District Attorney's Office dropped all charges against Plaintiff. His nightmare was finally over.

19. Plaintiff now seeks justice for the harm the Defendants have caused and redress for the loss of liberty and the terrible hardship he endured for over a decade and continues to suffer as a result of the Defendants' misconduct.

## JURISDICTION AND VENUE

20. Plaintiff brings this action pursuant to 42 U.S.C. § 1983 and California law to redress the Defendants' tortious conduct and their violation of Plaintiff's rights secured by the U.S. Constitution.

21. This Court has jurisdiction over Plaintiff's federal claims pursuant to 28 U.S.C. § 1331, and supplemental jurisdiction over his state law claims pursuant to 28 U.S.C. § 1367.

22. Venue is proper under 28 U.S.C. § 1391(b). Plaintiff's criminal case was investigated, tried, and appealed in County of San Francisco, California, such that a substantial part of the events and omissions giving rise to Plaintiff's claims occurred within this judicial district.

## PARTIES

23. Plaintiff Francisco Valle is a sixty-five-year-old man who spent over a decade wrongly imprisoned for a crime he did not commit.

24. Defendants Paolo Morgado and Dennis Cravalho are current or former officers and employees of the San Francisco Police Department. They both participated in the misconduct alleged in this complaint.

25. Defendant Angela Rouede is a current or former officer and employee of the San Francisco Police Department. At the relevant time, Defendant Rouede was a patrol officer who participated in the investigation of the events of May 19, 2007.

26. Defendant D. Olsen is a current or former officer and employee of the San Francisco Police Department. At the relevant time, Defendant Olsen was a detective assigned to participate in the investigation of the events of May 19, 2007.

27. Defendant Inspectors Michael Gaynor and Michael Philpott are current or former officers and employees of the San Francisco Police Department. Gaynor and Philpott served as

the homicide investigators assigned to investigate whether any criminal violations had been committed during the officer-involved shooting on May 19, 2007. They were the primary investigators responsible for the investigation that resulted in Valle being framed and ultimately convicted of a crime he did not commit.

28. Defendant Sergeant Jennifer Jackson was the primary investigator with Defendant City and County of San Francisco's Office of Civilian Complaints ("OCC") that was assigned to investigate complaints of misconduct by Cravalho. Jackson also investigated Morgado's misconduct for OCC.

29. Defendant Lieutenant Robert Moser was Defendant Jackson's supervisor with the OCC, and he oversaw her investigations into Cravalho and Morgado's misconduct. At relevant times, Moser also served as the Commanding Officer of the Management Control Division. In those roles, Moser had ongoing access to information about the investigations into Cravalho and Morgado's misconduct and the status of disciplinary proceedings against them.

30. At relevant times, Defendant Jerry Tidwell served as a custodian of records for the San Francisco Police Department's Legal Division, where he was responsible for compiling and disclosing material regarding Morgado and Cravalho's histories of misconduct to the prosecution and defense in Mr. Valle's criminal case. Tidwell also served, at relevant times, as the supervisor of the Management Control Division and the Director of the Risk Management Division. In both of those roles, Tidwell had access to information about the investigations of Cravalho and Morgado's misconduct and the status of disciplinary proceedings against them.

31. On information and belief, Tidwell was a supervisor of Defendants Moser and Jackson in their chain of command.

32. At relevant times, Defendant Paul Chignell was a captain in the San Francisco Police Department, and the commanding officer of the Taraval police district in which the May 19, 2007 officer-involved shooting occurred.

33. On information and belief, Chignell was a supervisor of Defendants Morgado and Cravalho in their chain of command.

34. As set forth in more detail below, Defendants Moser, Tidwell, and Chignell are sued for their direct involvement in constitutional violations. These Defendants are also liable as supervisors for constitutional violations because they knew that their subordinates were violating, or were about to violate, Plaintiff's constitutional rights, and they approved of, assisted with, condoned, ignored, or turned a blind eye to their subordinates' misconduct.

35. Defendant Unknown Officers of the San Francisco Police Department (hereinafter "Unknown Officer Defendants") also participated in the misconduct alleged in this complaint.

36. Defendants Morgado, Cravalho, Rouede, Olsen, Gaynor, Philpott, Jackson, Moser, Tidwell, Chignell and Unknown Officers of the San Francisco Police Department are referred to collectively hereinafter as "Individual Defendants."

37. The City and County of San Francisco was the employer of the Individual Defendants named above. The investigation of the attempted murder by the Individual Defendants, and the investigation of Cravalho and Morgado's history of misconduct, were conducted by the City and County of San Francisco, through its agencies and divisions, including the San Francisco Police Department, the Office of Civilian Complaints, the Management Control Division, and the Risk Management Division. In addition, the Individual Defendants acted at all times during the investigation of the attempted murder as agents of the City and County of San Francisco.

38. The City and County of San Francisco is responsible for indemnifying judgments against the Individual Defendants. In addition, it is liable for all torts the Individual Defendants committed pursuant to the doctrine of *respondeat superior*. Finally, it is liable for violations of Plaintiff's rights caused by the unconstitutional policies and customs of the San Francisco Police Department, including actions of the Individual Defendants.

39. Each Individual Defendant, known and unknown, acted under color of law and within the scope of his or her employment at all times relevant to this lawsuit. Unless otherwise noted, the Individual Defendants are sued in their individual capacity.

## FACTS

### I. PLAINTIFF FRANCISCO VALLE

40. In May 2007, Plaintiff was 51 years old and living at his family's ranch in Lodi, California.

41. He was a union painter, with his own painting business.

42. He had three daughters, and had just become a grandfather.

### II. THE NIGHT OF THE INCIDENT

#### A. Before the Shooting

43. On May 19, 2007, Plaintiff was in San Francisco visiting one of his daughters. He went to her home for dinner.

44. After dinner, Plaintiff met a friend named David Fuentes.

45. As Plaintiff and Fuentes were walking down 48th Street in San Francisco, Defendants Morgado and Cravalho drove up and slammed on the brakes.

46. Defendant Cravalho jumped out of the passenger seat with his gun drawn. Defendant Morgado drove the car to where Plaintiff was standing, almost running him over.

47. When the officers pulled up, Plaintiff had not committed any crime. Plaintiff immediately put his hands out to show he was unarmed.

48. Despite Plaintiff's clear demonstration that he was unarmed and wholly cooperative, Defendant Morgado began shooting at him.

49. As Plaintiff's hands were in the air, Defendant Morgado shot Plaintiff's middle finger on his right hand, causing him to bleed profusely. Another shot went over Plaintiff's head.

50. David Fuentes, standing nearby, then came running toward Plaintiff and ran up to him, in plain sight of both Defendants Morgado and Cravalho. Fuentes pulled out his own gun and shot back at Defendant Morgado.

51. In order to stop Fuentes from possibly shooting an officer, and to end the shoot-out between Fuentes and the officers, Plaintiff grabbed Fuentes' gun and fled.

52. Thanks to Plaintiff's actions, neither officer was shot or injured, nor was Fuentes.

53. Plaintiff did not know Fuentes was carrying a gun, and he saw it for the first time when Fuentes shot.

54. Plaintiff was found in the vicinity, laying behind a bush, bleeding profusely, and fearing that the officers would find him and try to kill him.

55. When the police officers found him, they unleashed police dogs that attacked Plaintiff and caused him to bleed from his shoulder.

56. Nevertheless, Plaintiff did not resist arrest when he was found. He was compliant just as he had been when he first encountered Defendants Morgado and Cravalho.

**B. The Defendants Interrogate and Harm Plaintiff**

57. After removing Plaintiff from the bushes, Defendants threw a blanket over him and shoved him into an ambulance.

58. In the ambulance, two to three Unknown Officer Defendants immediately began interrogating him. They accused him of shooting at Defendants Morgado and Cravalho, and repeatedly asked him why he did it. He was not given constitutionally require *Miranda* warnings.

59. Defendants interrogated Plaintiff in the ambulance despite the fact that he was in extreme distress, bleeding for hours from a gunshot wound to his right hand and from the dog's attack in the bushes. Yet, Plaintiff did not ever incriminate himself or succumb to pressure to falsely incriminate himself.

60. After going to the hospital, Plaintiff was taken into police custody. He was repeatedly interrogated by Unknown Officer Defendants, who continued to falsely accuse him of shooting at the officers and to pressure him to confess through intimidation, threats and physical abuse. When he insisted on having an attorney, Unknown Officer Defendants got angry and subjected him to further abuse.

61. Multiple Unknown Officer Defendants hit Plaintiff, injuring his ribs. He was also placed in solitary confinement at the San Francisco Jail, in an attempt to get him to break down and falsely implicate himself.

62. Despite the severe physical and psychological abuse, Plaintiff never falsely

implicated himself in any wrongdoing.

## III. THE INDIVIDUAL DEFENDANTS FRAME PLAINTIFF

### A. Defendants Manufacture a Case Against Plaintiff

63. Unable to obtain a false confession from Plaintiff, Defendants including Morgado, Cravalho, Roude, Olsen, Gaynor, and Philpott concocted a false case against Plaintiff on their own.

64. The Individual Defendants framed Plaintiff for a crime they knew he did not commit by fabricating evidence, concealing evidence of Plaintiff's innocence (and Defendants' lies), and testifying falsely at trial.

65. After the shooting, Defendants Morgado and Cravalho concocted a false story to cover up their egregious and reckless misconduct, and to shift the blame to Plaintiff, knowing that their cover-up would result in false charges and the wrongful conviction of an innocent man.

66. The other Individual Defendants participated in and furthered the scheme in order to protect Morgado and Cravalho from the consequences of their improper officer-involved shooting.

67. Defendants Morgado and Cravalho gave false statements claiming that Plaintiff had a firearm and shot at them.

68. Defendants Morgado and Cravalho falsely claimed that Plaintiff immediately opened fire on the police officers when they told him to put his hands up.

69. Defendants Morgado and Cravalho falsely claimed that Plaintiff was alone, and that they never saw anyone else with Plaintiff, let alone anyone else firing a weapon at the officers.

70. Defendant Morgado lied when he said he never fired a single shot, when in fact he had initiated the shooting.

71. As a result of this fabrication, Morgado's weapon was not inspected or collected by the officers responding to the scene and no gunshot residue evidence was collected that would have contradicted his false story.

72. Defendants Morgado and Cravalho caused fabricated police reports to be created

documenting their false statements, and they repeated their false statements under oath and at Plaintiff's criminal trial.

73. To bolster their flawed case against Plaintiff, Defendants also tried to link Plaintiff to a bicycle theft reported in the area by a witness.

74. When initially interviewed by police, the witness described the perpetrator of the bicycle theft as a white, blonde man in his 20's.

75. Plaintiff is a Hispanic man with a dark complexion and dark hair, and was in his 50's at the time of the incident.

76. Thus, he bore no resemblance to the perpetrator described by the witness.

77. Despite the extreme disparity in descriptions, Defendants Rouede, Gaynor, and Philpott decided to fabricate a positive identification of Plaintiff by the witness.

78. Under Gaynor and/or Philpott's instructions, Rouede administered a highly suggestive show-up of Plaintiff to the witness, in which she presented the witness with a handcuffed and restrained Valle, lying on a gurney in an ambulance, for identification. Rouede purposefully tainted and fabricated the identification by using influence and suggestion to fabricate a tentative positive identification by the witness of Plaintiff (as the perpetrator the witness had previously described as a white, blonde man in his 20's).

79. Rouede could have instead presented the witness with a fair line-up to test his memory and identification.

80. Instead, she used suggestive tactics in order to falsify evidence against Plaintiff.

81. Defendant Olsen also participated in the scheme to frame Plaintiff to cover up Morgado and Cravalho's improper conduct by falsifying evidence to link Plaintiff to Fuentes's gun through its previous owner—even though the previous owner knew Fuentes.

**B. The Defendants Suppress Critical Exculpatory Evidence**

82. Throughout their investigation and during Plaintiff's wrongful prosecution and imprisonment, Defendants suppressed critical exculpatory evidence, which if disclosed to state prosecutors or Plaintiff's defense attorneys would have exonerated Plaintiff.

83. Plaintiff's trial was a straightforward battle of credibility. Either the jury would believe Plaintiff about what happened, or it would believe Defendants Morgado and Cravalho's concocted story.

84. It turns out that at the time of Plaintiff's trial, Defendants Morgado and Cravalho were both liars and convicted criminals, with long histories of violent and aggressive behavior toward civilians, of abusing their authority as police officers, and of lying about their conduct. In a battle of credibility, they should have had none.

85. Defendant Morgado had a long history of prior civilian complaints, including numerous allegations of brutality and aggressive behavior toward civilians. His complaint history included accusations that he was involved in the killing of civilian Asa Sullivan, the unprovoked attack on civilian James Washburn; and the assault and false arrest of civilian Charles Haynes. He had also been convicted criminally of battery on a civilian. Despite all of this, he was never subjected to meaningful discipline or fired. At the time of trial, he was under investigation for using racist language and falsely arresting a U.S. Army veteran, and lying about it. It was only after this incident, captured on video, that he was finally fired by the San Francisco Police Department several months after Plaintiff's trial.

86. Defendant Cravalho had also been previously criminally convicted for misconduct. The California Court of Appeal, summarized records documenting his misconduct as follows:

> It may be safely said that the material describes misconduct that pretty much covers the rainbow. . . . It includes adjudicated criminality as well as actions that could be viewed as criminal. Recurring themes are Cravalho's belligerence and his tendency to evade accountability by emphasizing his status as a police officer. . . . [T]he breadth and magnitude of the claimed "misconduct" is impressive. And without question, some of it reflects adversely on Cravalho's ability to speak only truth.

87. The California Court of Appeal also characterized Defendant Cravalho as "a

proven teller of untruths, with an established history of aggressive conduct towards civilians, and demonstrated propensity for throwing around his weight as a police officer."

88. However, much of the evidence of the history of misconduct by Defendants Morgado and Cravalho was concealed from Plaintiff, his defense attorneys, and prosecutors.

89. Among other things, virtually all of Defendant Cravalho's criminal history and disciplinary misconduct was concealed from Plaintiff, his defense attorneys and prosecutors.

90. If Defendants had disclosed this evidence to Plaintiff, Plaintiff would have had powerful evidence of his innocence and material evidence to impeach the credibility of Defendants Morgado and Cravalho, who testified falsely against him at trial. Had the full spectrum of Defendants' misconduct been disclosed, Plaintiff's trial would have resulted in an acquittal.

91. Instead, Defendants concealed Morgado and Cravalho's misconduct from prosecutors, Plaintiff, and his defense attorneys.

92. For example, Defendant Sergeant Jackson investigated the complaints of misconduct against Cravalho and Morgado, and Defendant Moser supervised her work on those investigations.

93. Jackson and Moser were responsible for ongoing disclosure of their investigation of serious misconduct by Cravalho, and the status of discipline against him and Morgado, to criminal defendants such as Plaintiff—including but not limited to through the San Francisco Police Department's *Brady* Committee.

94. However, Jackson and Moser withheld information about Cravalho and/or Morgado, instead suppressing the information so that it was not provided to Mr. Valle's defense.

95. Jackson and Moser suppressed this information even though they knew that Cravalho and Morgado had been in an officer-involved shooting and were critical witnesses in the criminal case against Plaintiff.

96. At times between the May 19, 2007 incident and the start of Mr. Valle's trial in November 2010, Defendant Tidwell had knowledge and access to information about Cravalho

and Morgado's misconduct and the status of investigations and disciplinary proceedings against them.

97. Tidwell was also informed of the officer-involved shooting on May 19, 2007, and knew that Cravalho and Morgado were witnesses against Plaintiff in the criminal prosecution that resulted.

98. Nonetheless, Defendant Tidwell suppressed information about Cravalho and Morgado's histories of misconduct and the status of complaints and disciplinary actions against them.

99. Tidwell did so even though he served as a custodian of records responsible for compiling and disclosing such material to the prosecution (and defense) in Plaintiff's criminal case.

100. On information and belief, Tidwell was also a supervisor of Defendants Moser and Jackson.

101. Defendant Tidwell knew that Jackson and Moser were withholding information about Cravalho and Morgado's misconduct from Plaintiff in violation of his constitutional rights, but Tidwell nonetheless approved of, assisted with, condoned, ignored, and/or turned a blind eye to their misconduct.

102. At times between the May 19, 2007 incident and the start of Mr. Valle's criminal trial in November 2010, Defendant Chignell, too, was kept informed of Cravalho and Morgado's misconduct and the status of investigations and disciplinary proceedings against them.

103. Defendant Chignell, too, was likewise informed of the officer-involved shooting on May 19, 2007, and knew that Cravalho and Morgado were witnesses against Plaintiff in the criminal prosecution that resulted.

104. Nonetheless, Defendant Chignell suppressed information about Cravalho and Morgado's histories of misconduct and the status of investigations and disciplinary proceedings against them. He did so even though the events of May 19, 2007 took place in the police district he commanded, and even though, on information and belief, Chignell was a supervisor of

Defendants Cravalho and Morgado in their chain of command.

105. Chignell knew that Cravalho and Morgado had suppressed information about their histories of misconduct and the disciplinary proceedings against them from Plaintiff's defense, but Chignell nonetheless approved of, assisted with, condoned, ignored, and/or turned a blind eye to their misconduct.

106. Finally, as the homicide investigators assigned to investigate the officer-involved shooting on May 19, 2007, Defendants Gaynor and Philpott knew of both Morgado and Cravalho's status as the key witnesses against Plaintiff, and their full histories of misconduct and the ongoing investigations and disciplinary proceedings against them, but nonetheless suppressed this information.

107. Pleading in the alternative, Defendants including Jackson, Moser, Tidwell, and Chignell kept Gaynor and/or Philpott in the dark about Cravalho and Morgado's extensive complaint histories, misconduct investigations, and ongoing disciplinary proceedings, thereby suppressing information from the prosecution and defense in Plaintiff's criminal case.

108. As a result of Defendants' misconduct, Plaintiff was denied his due process rights including the right to a fair trial which was corrupted by false testimony and the suppression of material exculpatory evidence that could have been used at trial to discredit Defendants Morgado and Cravalho.

## IV. SAN FRANCISCO POLICE DEPARTMENT'S UNCONSTITUTIONAL POLICIES AND PRACTICES

109. Defendant City and County of San Francisco, through the San Francisco Police Department and Office of Citizen Complaints, was obligated to disclose the impeachment evidence above, but failed to do so.

110. Defendant City and County of San Francisco, by and through its policymakers in the San Francisco Police Department and Office of Citizen Complaints, also failed to meaningfully train, supervise or discipline Defendants Morgado and Cravalho despite their repeated acts of misconduct, effectively permitting them to act with impunity, and thus engage in

the egregious misconduct discussed above that resulted in Plaintiff's wrongful conviction.

111. These failures by Defendant City and County of San Francisco were not one-off accidents; rather, they were the result of systemic policies and practices, ratified at the highest levels of the San Francisco Police Department and Office of Citizen Complaints.

112. At all times relevant hereto, members of the San Francisco Police Department and Office of Citizen Complaints, including the Defendants in this action, systematically suppressed exculpatory and/or impeaching material by intentionally suppressing police reports, memos, citizen complaints, misconduct investigations, disciplinary records and other information that was not disclosed to the participants of the criminal justice system. As a matter of widespread custom and practice, these suppressed documents were withheld from prosecutors and from criminal defendants.

113. At all times relevant hereto, Defendant City and County of San Francisco, by and through its policymakers in the San Francisco Police Department and Office of Citizen Complaints, failed to meaningfully train, supervise and/or discipline its employees and agents, including Defendants, regarding their obligations to document and disclose exculpatory evidence pursuant to their *Brady* obligations.

114. Consistent with the municipal policies and practices described in the preceding paragraphs, employees of the City and County of San Francisco, including the named Defendants, concealed exculpatory evidence from Plaintiff.

115. As a matter of both policy and practice, municipal policy makers and department supervisors condoned and facilitated a code of silence within the San Francisco Police Department. In accordance with this code, officers refused to report and otherwise lied about misconduct committed by themselves and their colleagues, including the misconduct at issue in this case.

116. As a result of the City and County of San Francisco's established practice of neither tracking nor identifying police officers who are repeatedly accused of the same kinds of serious misconduct, failing to investigate cases in which the police are implicated in a wrongful

charge or conviction, failing to discipline officers accused of serious misconduct, and facilitating a code of silence within the San Francisco Police Department, officers (including the Defendants here) have come to believe that they may violate the civil rights of members of the public and cause innocent persons to be charged with serious crimes without fear of adverse consequences.

117. As a result of these policies and practices of the City and County of San Francisco, members of the San Francisco Police Department act with impunity when they violate the constitutional and civil rights of citizens, including at the time of Plaintiff's arrest and prosecution.

118. The Defendants engaged in the misconduct set forth in this Complaint because they had no reason to fear that the City and County of San Francisco and its Police Department would ever subject them to meaningful discipline, or terminate their employment, for doing so.

119. The policies and practices described in the foregoing paragraphs were consciously approved by City and County of San Francisco policymakers who were deliberately indifferent to the violations of constitutional rights described herein.

120. In addition, the policies and practices described in the foregoing paragraphs were systemic and persistent.

121. In addition to its failure to disclose *Brady* information related to Defendants Morgado and Cravalho, Defendants also failed to disclose the fact that one of the forensic investigators involved in Plaintiff's case, Mark Proia, was also under investigation for misconduct.

122. Additional examples of *Brady* violations stemming from Defendant City and County of San Francisco's policies and practices include the following:

123. In the period from 2007 to 2009, the San Francisco Police Department knew about gross misconduct involving a lab technician in its Crime Lab, Debbie Madden, which included evidence that she was abusing alcohol, and using drugs taken from the Crime Lab. Eventually when the information became public, hundreds of convictions resulting from lab analyses she conducted were dismissed. But for years, the San Francisco hid information about

her misconduct, and her lack of credibility, criminal defendants.

124. John Tennison and Antoine Goff were wrongly convicted and later exonerated in 2003 based on blatant Brady violations committed by the San Francisco Police Department. In that case, an eyewitness identified an alternate suspect as the perpetrator in a murder case, and informed police that neither Tennison nor Goff was present. This highly exculpatory information was withheld from them.

125. In that same case, a month after Tennison and Goff were convicted, police interviewed the alternate suspect in connection with a different investigation; the alternate suspect gave a videotaped confession to the murder for which Tennison and Goff were wrongly convicted. The San Francisco Police Department's officers failed to disclose that blockbuster exculpatory evidence to the prosecutor or defense attorney, which was eventually revealed inadvertently during a new trial motion hearing.

126. Caramond Conley was wrong convicted and exonerated in 2011. The lead investigator from the San Francisco Police Department started paying the key witness, an unemployed transient with a history of drug dealing, three months before Conley's trial. The payments totaled thousands of dollars, and police also provided the witness with the use of a house. None of this was evidence highly relevant to the key witness's credibility was disclosed to prosecutors or Conley's attorneys. In December 2010, San Francisco Superior Court Judge Marla Miller ruled that Conley had been wrongly convicted and he was released a month later.

127. Jamal Trulove was wrongly convicted of a July 2007 shooting, for which his conviction was throw out in 2014 and he was acquitted on re-trial in 2015. Among other things, San Francisco Police Department officers fabricated a statement and identification from a key witness, and suppressed evidence that they had shown individual photos of Trulove to two eyewitnesses before they later identified him as the perpetrator. In April 2018, a federal jury awarded Trulove $10 million based on police fabrications the and suppression of *Brady* evidence by San Francisco police officers.

128. Defendants City and County of San Francisco's policies and practices related to the failure to train, supervise and discipline police officers, thereby permitting and acquiescing in acts of misconduct toward civilians, include the following.

129. A 1996 investigative report found that in the prior 20 years, out of 100 on-duty shootings by San Francisco police officers, only one was found unjustified.

130. Sgt. John Haggett of the San Francisco Police Department repeatedly committed severe misconduct, but remained on the force. Haggett had an extensive history of misconduct, including two incidents of excessive force in the mid 1990s sufficiently severe that he received ninety-day suspensions in each case, and he was being investigated by the FBI for his involvement in the 1995 fatal shooting of an unarmed man. He had been named in six police brutality lawsuits that cost the City of San Francisco $235,000. Haggett had also been the target of dozens of citizen complaints, including 56 citizen complaints in his first seven years on the force, including a number of them alleging brutality. Yet, Haggett received promotions, and remained on the force until 2014, when he retired.

131. San Francisco Police Department officer Warrick Whitfield was convicted in 2012 for driving under the influence, and then convicted again when in 2014 he used his law enforcement access to dig up confidential information about a personal matter. He was not fired after either of these convictions.

132. Joseph Weatherman is another officer that had a long history of citizen complaints. He was the focus of many citizen complaints and was sued for the use of excessive force six times. In 1992, the San Francisco Police Department found that he had slapped and punched a suspect , and on another occasion he was found to have beaten a youth during an off-duty incident, requiring him to perform community service. He was not fired after either of these incidents, or the many citizen complaints against him.

133. The San Francisco Police Department's lack of concern or care about allegations of officer misconduct against civilians is demonstrated even at the hiring stage. Police officers with checkered histories, and even long civilian complaint and disciplinary histories in other

police departments, were still routinely hired.

134. By way of example, in 1994 the San Francisco Police Department hired Marc Andaya, a police officer who had racked up 37 civilian complaints in 11 years, as well as a number of police brutality lawsuits against him, while working for the Oakland Police Department. He was required to undergo a psychological profile and two psychologists warned that he was unfit to be a police officer. He then resigned and applied to the San Francisco Police Department. He admitted in his application to the San Francisco Police Department that he had excessive force complaints against him and that he had been suspended for 30 days for choking a suspect. The San Francisco Police Department's own psychologist indicated that he should not be hired "because of a future incident that might cause the department to look bad." He was hired anyway. Within a year, he was involved in a fatal assault by officers of a man in custody, resulting in public outrage and a federal lawsuit.

135. In 2007, the City of San Francisco's Controller conducted an audit that concluded that officers who should have been disciplined were not, because 53% of the time investigations into misconduct were not completed within the applicable deadlines, allowing the officers to go without any discipline at all.

136. In a 2009 article in the San Francisco Chronicle, Police Commission President Theresa Sparks was quoted as saying, "The [disciplinary] system is broken."

137. Maurice Caldwell was exonerated in 2011 after being wrongly convicted of a murder based on evidence fabricated by San Francisco Police Department Sergeant Kitt Crenshaw. In the two years before Crenshaw's involvement in the investigation resulting in Caldwell's wrongful prosecution and conviction, Crenshaw had received 25 citizen complaints of misconduct. Not a single one was sustained. Over the course of his career, Crenshaw amassed 66 citizen complaints. Yet, despite a prolific record of citizen complaints against him, Crenshaw was repeatedly promoted, all the way up to Commander.

138. A San Francisco Department of Police Accountability report that examined disciplinary findings of misconduct over the period from June 2017 to December 2019 found that

the vast majority of officers found to have misconduct received mere written reprimands, one or two day suspensions, or no consequences at all. In the rare cases when an officer was found to have committed misconduct, and meaningful discipline was recommended by agency investigators, the Police Chief reduced the punishment.

## V. PLAINTIFF'S WRONGFUL CONVICTION AND EXONERATION

139. On December 9, 2010, as the result of Defendants' misconduct and based on the false evidence described in this Complaint, Plaintiff was wrongly prosecuted and ultimately convicted of attempted murder and related charges.

140. Plaintiff was sentenced to state prison for two consecutive life terms plus 45 years in prison.

141. Without the Defendants' fabrication, manufacturing, and suppression of evidence, Plaintiff never would have been arrested, prosecuted, or convicted.

142. During Plaintiff's criminal proceedings, Defendants provided false statements and testimony based on evidence they had fabricated. They provided these false statements to state prosecutors and to state court judges and juries in order to secure the wrongful conviction of Plaintiff.

143. On direct appeal, the Court of Appeal for the State of California determined that Defendants had violated their constitutional obligations under *Brady v. Maryland* by concealing exculpatory and impeaching evidence from Plaintiff, in particular Defendants Morgado's and Cravalho's rich histories of misconduct.

144. The Court of Appeal vacated Plaintiff's conviction and granted him a new trial, and on July 24, 2020, the San Francisco District Attorney's Office dropped all charges against Plaintiff. He was finally exonerated.

## VI. PLAINTIFF'S INJURIES

145. For more than 13 years, Plaintiff was imprisoned, in custody, and lost his liberty while facing attempted murder charges, all for a crime he did not commit. Throughout his imprisonment, Plaintiff did not know whether he would ever be free again.

146. Plaintiff's whole life was turned upside down without any warning. He was taken away from his family and friends, including his three daughters. He missed out on their lives, including key milestones in his life of his daughters and others. He missed his oldest daughter's wedding, unable to walk her down the aisle. Her first child was born one month before his arrest, and her second child was born in 2009 while he was in custody. He was not able to experience the joy of being a grandfather, missing the opportunity to spend time with his grandchildren when they were young.

147. He returned home to relationships changed or lost by decades away, and to a changed world.

148. His father and grandmother both died while he was in prison. He was not able to properly mourn their passing, or find solace in the comfort of family. He was not permitted to attend either of their funerals.

149. Plaintiff was robbed of a significant portion of his lifespan. He was deprived of all of the basic pleasures of human experience, which all free people enjoy as a matter of right, including the freedom to live one's life as an autonomous human being.

150. Plaintiff lost his career, including the opportunity to grow and advance in his professional pursuits.

151. During his decades of wrongful imprisonment, Plaintiff was detained in harsh and dangerous conditions. Despite the brutality of prison and the injustice of being locked away for something he had not done, Plaintiff was a model prisoner.

152. In addition to causing Plaintiff the severe trauma of wrongful imprisonment, loss of his liberty, and reputational harm, the Defendants' misconduct continues to cause Plaintiff extreme physical and psychological pain and suffering, humiliation, fear, nightmares, anxiety, depression, and despair, rage, and other physical and psychological effects.

**COUNT I**
**42 U.S.C. § 1983 – Fourteenth Amendment Due Process**
**Against the Individual Defendants**

153. Plaintiff incorporates each paragraph of this complaint as if fully restated herein.

154. As described above, the Individual Defendants, while acting individually, jointly, and/or in conspiracy with each other, as well as under color of law and within the scope of their employment, deprived Plaintiff of his constitutional right to due process and his right to a fair trial.

155. In the manner described more fully above, the Individual Defendants deliberately withheld exculpatory and impeachment evidence from Plaintiff, his attorneys, and prosecutors, among others, thereby misleading and misdirecting Plaintiff's criminal prosecution.

156. In addition, as described more fully above, the Individual Defendants fabricated and solicited false evidence, including testimony they knew to be false, fabricated police reports and other evidence falsely implicating Plaintiff, obtained charges against Plaintiff, obtained his conviction using that false evidence, and failed to correct fabricated evidence they knew to be false when it was used against Plaintiff during his criminal trial.

157. In addition, on information and belief, the Individual Defendants concealed and fabricated additional evidence that is not yet known to Plaintiff.

158. The Individual Defendants' misconduct described in this count resulted in Plaintiff's unjust and wrongful criminal prosecution and conviction, deprived him of his liberty, and denied him his constitutional rights protected by the Fifth and Fourteenth Amendments. Absent this misconduct, Plaintiff's prosecution could not and would not have been pursued.

159. The misconduct described in this count was objectively unreasonable and was undertaken intentionally, with malice, with reckless indifference to the rights of others, and with total disregard for the truth and Plaintiff's clear innocence.

160. As a result of the Individual Defendants' misconduct described in this count, Plaintiff suffered loss of liberty, great mental anguish, humiliation, degradation, physical and emotional pain and suffering, and other grievous and continuing injuries and damages.

161. The Individual Defendants' misconduct described in this count was undertaken

pursuant to the City and County of San Francisco's policies, which are more fully described in this Complaint.

**COUNT II**
**42 U.S.C. § 1983 – Fourth Amendment Illegal Detention and Prosecution Against Individual Defendants**[1]

162. Plaintiff incorporates each paragraph of this complaint as if restated fully herein.

163. In the manner described more fully above, the Individual Defendants, individually, jointly, and in conspiracy with each other, as well as under color of law and within the scope of their employment, accused Plaintiff of criminal activity and exerted influence to initiate, continue, and perpetuate judicial proceedings against Plaintiff without any probable cause for doing so and in spite of the fact that they knew Plaintiff was innocent, in violation of his rights secured by the Fourth Amendment.

164. In so doing, the Individual Defendants caused Plaintiff to be deprived of his liberty and detained without probable cause and subjected improperly to judicial proceedings for which there was no probable cause.

165. The misconduct described in this count was objectively unreasonable and was

[1] Plaintiff acknowledges that this Court previously dismissed Plaintiff's Fourth Amendment illegal detention and prosecution claim with prejudice against Defendants Cravalho and Morgado on the basis of untimeliness, reasoning in part that the Supreme Court had "expressly left open the question of what the proper accrual date should be for § 1983 challenging post-process pretrial detention under the Fourth Amendment." Dkt. 30 at 5-6; *id.* 5-11. However, the Supreme Court recently clarified the law on accrual of such claims for unreasonable seizure pursuant to legal process (also referred to as Fourth Amendment malicious prosecution claims). *See Thompson v. Clark*, No. 20-659, 2022 WL 994329, *3 (U.S. Apr. 4, 2022). *Thompson* held that favorable termination was an element of a such a claim. *Id.* at *4. As such, the claim necessarily cannot accrue before that element has been satisfied. *See* Dkt. 30 at 7; *see also Long v. City of Corona, et al.*, Case 5:21-cv-02008-DSF-E (C.D. Cal.), Dkt. 57, at 4-8 (concluding, based on *Thompson,* that a Fourth Amendment unlawful detention claim pertaining to the plaintiff's prosecution and conviction did not accrue until favorable termination). Plaintiff thus respectfully submits that if, notwithstanding *Thompson*, any Defendant re-asserts a statute of limitations defense to Count II, the matter should be re-briefed so that this Court may consider the impact of *Thompson*.

undertaken intentionally and with malice.

166. As a result of the Individual Defendants' misconduct described in this Count, Plaintiff suffered loss of liberty, great mental anguish, humiliation, degradation, physical and emotional pain and suffering, and other grievous and continuing injuries and damages.

167. The Individual Defendants misconduct described in this count was undertaken pursuant to the City and County of San Francisco's policies, which are more fully described in this Complaint.

**COUNT III**
**42 U.S.C. § 1983 – Failure to Intervene**
**Against the Individual Defendants**

168. Plaintiff incorporates each paragraph of this complaint as if restated fully herein.

169. In the manner described above, during the prolonged investigation and prosecution of Plaintiff, one or more of the Individual Defendants stood by without intervening to prevent the violation of Plaintiff's constitutional rights, even though they had the duty and the opportunity to do so. The Individual Defendants failed to intervene despite knowledge of constitutional violations described above, including the falsification of evidence against Plaintiff and the suppression of evidence of Cravalho and Morgado's histories of misconduct.

170. These Individual Defendants had a duty and reasonable opportunity to prevent the deprivation of Plaintiff's constitutional rights, but they failed to do so.

171. The misconduct described in this count was objectively unreasonable and was undertaken intentionally with willful indifference to Plaintiff's constitutional rights.

172. As a result of the Individual Defendants' failure to intervene to prevent the violation of Plaintiff's constitutional rights, Plaintiff suffered loss of liberty, great mental anguish, humiliation, degradation, physical and emotional pain and suffering, and other grievous and continuing injuries and damages as set forth above.

173. The Individual Defendants' misconduct described in this count was undertaken pursuant to the City and County of San Francisco's policies, which are more fully described in this Complaint.

**COUNT IV**
**42 U.S.C. § 1983 – Conspiracy**
**Against the Individual Defendants**

174. Plaintiff incorporates each paragraph of this complaint as if restated fully herein.

175. The Individual Defendants reached an agreement among themselves to frame Plaintiff for attempted murder, and thereby to deprive Plaintiff of his constitutional rights, as described above. This agreement was first reached before arresting Plaintiff, and it remained in place throughout all periods of his wrongful detention, prosecution, and incarceration.

176. In addition, the Individual Defendants conspired before Plaintiff's conviction, and continued to conspire after his conviction, to deprive Plaintiff of exculpatory material to which he was entitled and that would have led to his earlier exoneration.

177. In this manner, the Individual Defendants, acting in concert with each other and with other co-conspirators, known and unknown, conspired by concerted action to accomplish an unlawful purpose and/or a lawful purpose by unlawful means.

178. In furtherance of the conspiracy, each co-conspirator committed overt acts and was an otherwise willful participant in joint activity.

179. As a result of this illicit prior agreement, Plaintiff suffered loss of liberty, great mental anguish, humiliation, degradation, physical and emotional pain and suffering, and other grievous and continuing injuries and damages as set forth above.

180. The misconduct described in this count was objectively unreasonable and was undertaken intentionally and with willful indifference to Plaintiff's constitutional rights.

181. The Individual Defendants' misconduct described in this count was undertaken pursuant to the City and County of San Francisco's policies, which are more fully described in

this Complaint.

**COUNT V**
**42 U.S.C. § 1983 – Policy & Custom Claims**
**Against City and County of San Francisco**

182. Plaintiff incorporates each paragraph of this complaint as if fully restated herein.

183. The City and County of San Francisco employed the Individual Defendants, supervised them, and promulgated policy, including written policies and unwritten customs, that caused the wrongful conviction of Plaintiff, as described above.

184. Plaintiff's injuries described in this complaint and the violations of his constitutional rights discussed above were caused by the policies and customs of the City and County of San Francisco, as well as by the actions of policy-making officials for City and County of San Francisco.

185. At all times relevant to the events described in this complaint and for a period of time before and after, the City and County of San Francisco failed to promulgate proper or adequate rules, regulations, policies, and procedures governing the collection, documentation, preservation, and disclosure of material exculpatory evidence and impeachment evidence, and information bearing upon the credibility of both lay and law-enforcement witnesses, to prosecutors and criminal defendants.

186. In addition or alternatively, the City and County of San Francisco failed to promulgate proper and adequate rules, regulations, policies, procedural safeguards, and procedures for the training and supervision of officers and agents of the San Francisco Police Department to ensure the disclosure of material exculpatory evidence and impeachment evidence, and information bearing upon the credibility of both lay and law-enforcement witnesses, to prosecutors and criminal defendants.

187. In addition or alternatively, the City and County of San Francisco failed to promulgate proper and adequate rules, regulations, policies, procedural safeguards, and

procedures for the training, supervision and discipline of officers accused of misconduct. As described in the foregoing paragraphs of this complaint, this includes the process for investigating allegations of misconduct, and imposing meaningful discipline for misconduct, including criminal behavior and untruthfulness.

188. Officers and agents of the City and County of San Francisco committed these failures to promulgate proper or adequate rules, regulations, policies, and procedures.

189. Had officers and agents of the City and County of San Francisco promulgated appropriate policies, then the violation of Plaintiff's constitutional rights would have been prevented.

190. In addition, at all times relevant to the events described in this complaint and for a period of time before, the City and County of San Francisco had notice of the practices and customs by officers and agents of the San Francisco Police Department set forth in the preceding paragraphs.

191. These practices and customs, individually and/or together, were allowed to flourish because the leaders, supervisors, and policymakers of the City and County of San Francisco directly encouraged and were thereby the moving force behind the very type of misconduct at issue by failing to adequately train, supervise, and control their officers, agents, and employees and discipline prior instances of similar misconduct, thus directly encouraging future abuses like those affecting Plaintiff.

192. The above practices and customs, so well settled as to constitute de facto policies of the City and County of San Francisco, were able to exist and thrive, individually and/or together, because policymakers with authority over the same exhibited deliberate indifference to the problem, thereby effectively ratifying it.

193. In addition, the misconduct described in this count was undertaken pursuant to the City and County of San Francisco's policies and practices in that the constitutional violations

committed against Plaintiff were committed with the knowledge, approval, or endorsement of persons with final policymaking authority for the City and County of San Francisco or were actually committed by persons with such final policymaking authority.

194. As a consequence, the final policy makers for the City and County of San Francisco approved of, adopted, and therefore ratified the actions of the Individual Defendants, including their violations of Plaintiff's constitutional rights, making the City and County of San Francisco liable for this misconduct. In fact, the final policy makers for the City and County of San Francisco have continued to defend the misconduct of the Individual Defendants, rather than take steps to correct the obvious faults and failures with the investigation, and perform appropriate discipline and training to prevent further abuses.

195. Plaintiff's injuries and the constitutional violations he suffered were caused by officers, agents, and employees of the City and County of San Francisco, including but not limited to the Individual Defendants, who acted pursuant to one or more of the policies, practices, and customs set forth above in engaging in the misconduct described in this count.

**COUNT VI**
**State Law Claim – Intentional Infliction of Emotional Distress**
**Against the Individual Defendants**

196. Plaintiff incorporates each paragraph of this complaint as if restated fully herein.

197. The Individual Defendants' qualifying misconduct described in this Count occurred pre-arraignment.

198. The Individual Defendants' pre-arraignment actions and conduct as set forth above were extreme and outrageous. The Individual Defendants' actions were rooted in an abuse of power or authority, and were undertaken with intent to cause, or were in reckless disregard for the probability that they would cause Plaintiff severe emotional distress, as more fully alleged above.

199. As an actual and proximate result of the Individual Defendants' actions, Plaintiff

suffered and continues to suffer severe emotional distress.

**COUNT VII**
**State Law Claim – Civil Conspiracy**
**Against the Individual Defendants**

200. Plaintiff incorporates each paragraph of this complaint as if restated fully herein.

201. As described more fully above, the Individual Defendants, acting in concert with other co-conspirators, known and unknown, reached an agreement among themselves to frame Plaintiff for a crime he did not commit and conspired by concerted action to accomplish an unlawful purpose by unlawful means. In addition, these co-conspirators agreed among themselves to protect Morgado and Cravalho from liability for depriving Plaintiff of his rights.

202. In furtherance of the conspiracy, each of the co-conspirators committed overt acts and was otherwise a willful participant in joint activity.

203. The violations of California law described in this complaint, including but not limited to the Individual Defendants' malicious prosecution of Plaintiff and their intentional infliction of emotional distress, were accomplished by Defendants' conspiracy.

204. The misconduct described in this count was objectively unreasonable and was undertaken intentionally and with willful indifference to Plaintiff's constitutional rights.

As a result of the Individual Defendants' misconduct described in this count, Plaintiff suffered loss of liberty, great mental anguish, humiliation, degradation, physical and emotional pain and suffering, and other grievous and continuing injuries and damages.

**COUNT VIII**
**State Law Claim – Tortious Hiring and Retention**
**Against City and County of San Francisco**

205. Plaintiff incorporates each paragraph of this complaint as if restated fully herein.

206. The City and County of San Francisco had a legal duty to use reasonable care in its hiring and retention of San Francisco police officers, including the Individual Defendants.

207. The City and County of San Francisco failed to use reasonable care it its hiring and retention of the Individual Defendants. As more fully alleged above, it hired and retained officers like Defendants Morgado and Cravalho, who were incompetent and unfit to perform their jobs.

208. The City and County of San Francisco knew or should have known that hiring and retaining these officers posed a danger to the residents of San Francisco, and yet it intentionally and recklessly hired, retained, and promoted such officers.

209. Indeed, the City and County of San Francisco, and its agents and employees, had a special relationship with Defendants Morgado and Cravalho—foreseeably dangerous persons based on their long histories of prior complaints, documented lying, and abusive conduct, as set forth above—that gave rise to an ability and duty to control the conduct of those Defendants.

210. As an actual and proximate result of the City and County of San Francisco's actions, Plaintiff suffered loss of liberty, great mental anguish, humiliation, degradation, physical and emotional pain and suffering, and other grievous and continuing injuries and damages.

**COUNT IX**
**State Law Claim – Cal. Gov. Code § 815.2, *Respondeat Superior***
**Against City and County of San Francisco**

211. Plaintiff incorporates each paragraph of this complaint as if restated fully herein.

212. Plaintiff suffered the aforementioned injuries as a proximate result of the Individual Defendants' misconduct.

213. During all relevant times, the Individual Defendants were employees and agents of the City and County of San Francisco and its subdivisions, including the San Francisco Police Department and Office of Civilian Complaints, acting within the scope of their employment or agency.

214. Defendant City and County of San Francisco is liable as principal for all state law torts committed by its agents.

**COUNT X**
**State Law Claim – Cal. Civ. Code § 52.1**
**Against the Individual Defendants**

215. Plaintiff incorporates each paragraph of this complaint as if restated fully herein.

216. As described more fully above, the Individual Defendants intentionally interfered with Plaintiff's exercise or enjoyment of rights secured by the U.S. Constitution and the laws of California.

217. The Individual Defendants' conduct in violating Plaintiff's constitutional rights was carried out with specific intent to violate those rights, as described above.

218. The Individual Defendants' conduct in interfering with Plaintiff's rights was also carried out by threats, intimidation, and or coercion, as described above.

219. As a result of the Individual Defendants' misconduct described in this Count, Plaintiff was deprived of his constitutional rights; wrongly prosecuted, detained, and kept in custody for more than a decade; and subjected to other grievous injuries and damages as set forth above.

WHEREFORE, Plaintiff FRANCISCO VALLE, respectfully requests this Court enter a judgment in his favor and against Defendants PAOLO MORGADO, DENNIS CRAVALHO, ANGELA ROUEDE, DETECTIVE D. OLSEN, MICHAEL GAYNOR, MICHAEL PHILPOTT, JENNIFER JACKSON, ROBERT MOSER, JERRY TIDWELL, PAUL CHIGNELL, CITY AND COUNTY OF SAN FRANCISCO, and UNKNOWN OFFICERS OF THE SAN FRANCISCO POLICE DEPARTMENT, awarding compensatory damages, attorneys' fees and costs against each defendant, and, because they acted willfully, wantonly, and/or maliciously, punitive damages against each of the Individual Defendants, as well as post-judgment interest, and any other relief this Court deems just and appropriate.

**JURY DEMAND**

Plaintiff FRANCISCO VALLE hereby demands a trial by jury pursuant to Federal Rule of Civil Procedure 38(b) on all issues so triable.

**DATED: June 14, 2022**

Respectfully submitted,

**FRANCISCO VALLE**

By: s/ Ruth Brown

One of His Attorneys

David B. Owens
Anand Swaminathan*
Steven Art*
Ruth Brown*
Isabella Aguillar*
LOEVY & LOEVY
311 N Aberdeen St., 3rd Fl
Chicago, IL 60607
david@loevy.com
ruth@loevy.com
anand@loevy.com
T: 312-243-5900
F: 312-243-5902
*Admitted pro hac vice
*Attorneys for Plaintiff*

**CERTIFICATE OF SERVICE**

I, Ruth Brown, an attorney, certify that on June 14, 2022, the foregoing was filed via the court's ECF system, which effectuated service on all counsel who have appear in the case.

/s/ Ruth Brown